[No. 10601.  Department One.  December 18, 1912.]

## C. H. PETERSON, *Respondent*, v. SEATTLE ELECTRIC COMPANY, *Appellant*.[1]

STREET RAILWAYS—INJURIES TO PERSONS ON TRACK—ACTIONS—INSTRUCTIONS.  In an action for injuries sustained in a collision between a vehicle and a street car, an instruction that it was the duty of the motorman, when it became apparent to him that the plaintiff was about to cross the track, to use every care within his power to avoid a collision, is not prejudicially erroneous, where by other instructions the defendant was held to the rule of reasonable care.

SAME.  In such a case, it is not error to refuse to instruct that the defendant was not required to give a warning of the car's approach, where there was evidence that the car was going at a rate of speed which increased the hazards.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT.  A verdict for $15,250, for a fracture of the hip joint, reduced by the trial court to $10,250, is still excessive, unless $2,500 is remitted, where there was considerable doubt and speculation as to the character of the injuries, the plaintiff walked six or eight blocks and back to see a physician six days after the accident, and there was no evidence that his earning capacity had been impaired.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered February 10, 1912, upon the verdict of a jury rendered in favor of the plaintiff for $10,250, for personal injuries sustained in a collision with a street car.  Reversed, unless $2,500 is remitted.

*James B. Howe* and *H. S. Elliott*, for appellant.

*Walter S. Fulton*, for respondent.

CHADWICK, J.—Respondent Peterson was injured in a collision between a wagon he was driving across the track of the appellant company and one of its electric cars.  From a verdict in favor of respondent, this appeal is prosecuted.

[1]Reported in 128 Pac. 650.

Errors are assigned in the giving and refusing to give instructions, and it is insisted that the judgment, even as reduced by the court, is still excessive. We have examined the instructions of the court with some care, and we are of the opinion that, taken as a whole, and in the light of the testimony, they fairly state the law of the case, and we will not discuss any of them except the following.

The court said:

"If, under all the circumstances, the motorman was justified in presuming, as a reasonably careful motorman, that this vehicle was going to continue to be driven in the direction in which it was going, and not turn across the street, then it was not necessary for him to take any unusual precautions to stop his car until it became apparent to him that he was about to cross the track of the company, *and when that became apparent to him, then it was his duty to exercise every care within his power to avoid a collision.*"

The italicized words are objected to and assigned as error. If these words stood alone they would probably be subject to criticism, but we must assume that the court intended, and the jury understood, that the words "every care within his power" had reference to such care as would suggest itself to a "reasonably careful motorman" "under all the circumstances." In other words, the instruction must be taken as a whole; and when so taken, we are unable to agree with the contention of the appellant. Furthermore, the court had said that it was the duty of the motorman "to exercise care whenever an accident becomes imminent;" "as soon as it became apparent that the driver of the vehicle was about to cross the track, it was the duty of the motorman to exercise every reasonable precaution to avoid a collision;" "it is for you to find. . . whether he used reasonable care to avoid a collision." The court also charged the jury that the motorman was justified in presuming that plaintiff's vehicle would be driven in the direction in which it was going, and generally throughout the instructions the court has held the defendant to the rule of reasonable care. There was no error

in the court's instructions, under the rule announced in many cases. *Morrison v. Seattle Elec. Co.*, 63 Wash. 531, 115 Pac. 1076; *Engelking v. Spokane*, 59 Wash. 446, 110 Pac. 25, 29 L. R. A. (N. S.) 481; *Coffer v. Erickson*, 61 Wash. 559, 112 Pac. 643; *Edwards v. Seattle, Renton etc. R. Co.*, 62 Wash. 77, 113 Pac. 563; *Beseloff v. Strandberg*, 62 Wash. 36, 113 Pac. 250; *Richmond v. Tacoma R. & Power Co.*, 67 Wash. 444, 122 Pac. 351; *Scherrer v. Seattle*, 52 Wash. 4, 100 Pac. 144; *Leland v. Chehalis Lumber Co.*, 68 Wash. 632, 123 Pac. 1086.

Defendant requested the following instructions:

"The plaintiff complains in his complaint, gentlemen of the jury, as one of the grounds of negligence alleged against the defendant, that no proper warning was given of the approaching car. Under the circumstances of this case I instruct you that the law does not require the defendant to give warning of cars' approach, I therefore instruct you to entirely disregard the question of whether or not the gong was sounded or other warning was given by the motorman of the car which collided with the plaintiff's wagon, in arriving at your verdict."

It might be that, properly qualified, this instruction could have been given with propriety; that is to say, if the jury had been told that, if they found that the car was going at a reasonable rate of speed or at a rate not exceeding twelve miles an hour, as provided in the ordinances of the city, it would have been proper enough; but there is testimony in the case, and it must have been considered and believed by the jury, that the car was going at an unreasonable rate of speed. If a motorman assumes to drive his car at an excessive speed, he cannot be excused from his duty to ring the bell and give such warning as is commensurate with increased hazard, for it is the measure of due care. There was no error in refusing to give the requested instruction. We are satisfied that the verdict should not be set aside because of error in law.

Plaintiff was painfully injured at the time of the accident. He has offered testimony tending to show that his hip was broken; that he was laid up for a considerable time and can now go about only on crutches, although he admits on cross-examination that he attends to customers at his place of business, and can walk about or across the room without crutches. A peculiar feature of this case is that the medical men who testified in plaintiff's behalf are not entirely agreed as to the character of the injury. One physician says it was a fracture of the acetabulum, which is the cavity or socket of the hip bone into which the head of the thigh bone or femur fits, as a ball and socket. He also says: "It seemed to us, there was a slight crepitus or roughness in the joint." He doubts "whether there was a fracture of the neck of the femur." Another physician says: "It was a fracture of the joint . . . the femur is somewhat displaced upwards . . . I think the articular surface of the bone was slightly fractured . . . it seems as though the neck of the bone has been fractured . . . there is no distinct line of fracture visible." The same witness, when recalled, said: "It looked like the rim of the acetabulum had been crushed." Another physician says: "My first impression was a fracture of the neck. It does not show a distinct line of fracture, as some fractures show, for possibly one main reason, that at the present time I believe them to be due to some hypertrophic arthritis. I believe there has been a disease of the bone before possibly, yes, hypertrophic arthritis of the bone; I believe that to have been the case possibly some time before the accident; the condition at the present time I believe to be due to this particular condition, the accident." He further said that "the present condition might be due to both the accident and to hypertrophic arthritis," and, "yes, I believe that there has been hypertrophic arthritis." The medical testimony offered on the part of appellant is to the effect that hypertrophic arthritis is indicated. Hypertrophic arthritis is thus described:

"This condition is most common in men along about middle life or old age. There is no definite organism connected with it. It is not caused by an organism connected with it. The pathology of it—there appears to be some inflammatory trouble upon the articular surface of the head of the femur, also on the articular surface lining the socket of the hip joint. This inflammatory trouble is just beneath the cartilage which lines this (showing). The inflammation being the trouble, causes a softening of the bone underlying the cartilage. This bone becomes soft and the pressure of the hip bone upon the socket in walking and using it, causes the underlying softened bone to become flattened out and irritating the cartilage covering this softened bone finally becomes ossified and forms exostosis about the joint. "Q. Forms what? A. Exostosis. That is a growth on the bone; more bone formed than is normal. The softening of the head of the bone results in the flattening of the head of the bone and softening around the cap or shaft and socket, with the accompanying laying down of new bone gradually forms new bone around the head of the femur, so that in advanced cases the socket instead of being only partially covering the head of the bone, almost completely encircles the head of the bone, thus restricting the motion of the joint. That restriction of the motion of the joint, due to laying down of cartilage and new bone, is what causes pain on attempting to move the joint."

The medical testimony was based largely upon X-ray photographs. It will be seen that these medical men, all of whom seem to be sincere and unbiased witnesses, have indulged in more or less speculation. More than this, plaintiff did not consult a physician until four days after the accident, during which time he made two or three trips on foot to his place of business. He says he limped and dragged along, and we will take it at that. He lived four or five blocks from his place of business. Six days after the accident, he walked six or eight blocks to the Cobb building to see a physician, and walked home again. There is no testimony tending to show that his earning capacity has been

12—71 WASH.

impaired, or that his business is suffering because of his present condition.

The verdict was for $15,250. This the court reduced to $10,250. In *Martin v. Hill*, 66 Wash. 433, 119 Pac. 849; *Lynch v. Northern Pac. R. Co.*, 67 Wash. 113, 120 Pac. 882, and *Smith v. Seattle Elec. Co.*, 61 Wash. 175, 112 Pac. 87, we held that we would not ordinarily make a further reduction in a verdict when the trial court had made a substantial reduction; but it does seem to us the judgment in this case, considering all the evidence, is penal rather than compensatory. The fact that the trial judge reduced the judgment indicates to our minds that he was convinced that the jury was moved by passion and prejudice; and considering further the very substantial doubt as to the character of plaintiff's injuries and the extent to which they may be justly attributed to the accident, we have decided to give plaintiff the option of taking a new trial, or reducing the judgment in the sum of $2,500. If the judgment is satisfied to the extent of $2,500, within thirty days after the remittitur goes down, the judgment will be affirmed. If not, the court will retry the case.

MOUNT, C. J., GOSE, CROW, and PARKER, JJ., concur.